JOHN C. JOHNSON, [1] Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent Johnson v. Commissioner
Docket No. 32197-85
United States Tax Court
T.C. Memo 1993-272; 1993 Tax Ct. Memo LEXIS 276; 65 T.C.M. (CCH) 2984; June 23, 1993, Filed *276 John C. Johnson, pro se. For respondent: Wendy Sands and Jody Tancer. DAWSON
DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: This case was assigned to Special Trial Judge Larry L. Nameroff pursuant to section 7443A(b)(4) and Rules 180, 181, and 183. [2] The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE NAMEROFF, Special Trial Judge: Respondent determined a deficiency in petitioner's 1983 Federal income tax in the amount of $ 16,149.16, plus additions to tax under section 6653(a)(1) in the amount of $ 807.46, under section 6653(a)(2) in the amount of 50 percent of the interest due on the entire understatement, and under section 6659 in the amount of $ 4,884.75. [3] Respondent also asserted in the Answer that petitioner is liable for increased interest *277 under section 6621(c) (formerly section 6621(d)). [4]
This case was part of a national litigation project regarding Philatelic Leasing. The project originally included over 800 individual taxpayers. Although a number of the taxpayers settled, this is the second case in this project to be litigated. The first case to be tried was , on appeal (4th Cir., Oct. 13, 1992). In Whittaker, we decided that the taxpayers were not entitled to deductions and investment tax credit claimed because they failed to prove that the stamp master leasing activity had economic substance and was not a sham. However, we also decided that deductions for interest payments actually made *278 on the recourse note were allowable. Petitioner contends that in his case the stamp leasing activity had economic substance and that he entered into such activity with the requisite profit objective. Upon review of the record of petitioner's case, we find few facts which differ from those in Whittaker; moreover, those additional or differing facts are not material. Accordingly, except for the deduction for interest, we reach the same conclusion as in Whittaker. However, for the sake of completeness, we will go through the analysis undertaken by this Court in Whittaker. Respondent conceded the addition to tax under section 6659 and the disallowance of the investment tax credit. [5] After these concessions, the issues for decision are: (1) Whether petitioner is entitled to deductions, including interest, with respect to the leased stamp master; (2) whether petitioner is liable for the additions to tax under section 6653(a)(1) and (2); and (3) whether petitioner is liable for increased interest under section 6621(c) (formerly section 6621(d)). *279 FINDINGS OF FACT Some of the facts have been stipulated and they are found accordingly. At the time the petition herein was filed, petitioner resided in West Covina, California. During 1983, petitioner was employed full time as a regional sales manager for Aluminum Maintenance Systems, Inc. Petitioner's former wife, Rose Ann Johnson, was employed full time by Interchecks, Inc. Petitioner and Mrs. Johnson reported combined wages on their joint 1983 Federal income tax return in the amount of $ 84,586. Philatelic Leasing, Ltd.
The Philatelic Leasing, Ltd. (Philatelic), program offered prospective investors an opportunity to lease a master plate (the stamp master) from which British local stamps for the privately-owned islands of Bernera, Eynhallow, and Staffa (islands located off the coast of Scotland), and ancillary products, such as calendars, postcards, or stationery, could be produced. These local stamps (also referred to as "local carriage labels") are not postage stamps, as they are not recognized either by the British Government or any other organized postal system as prepayment of postage. Rather, the stamps offered in the Philatelic program could only be used *280 as postage within the private mailing system of each issuing island, and, once mail utilizing such stamps was deposited in the British public or governmental mail system, or any other organized postal system, additional postage was required. Accordingly, the majority of the local stamps in the Philatelic program were issued solely for sale to collectors. The Philatelic program, described in the Confidential Offering Memorandum for the Leasing of Master Plates for the Production of British Local Stamps and Ancillary Products (the offering memorandum), provided for the 7-year lease of stamp masters to investors. Each stamp master consisted of photographic color separations from which the various local stamps would be produced, together with the related copyrights. Furthermore, each of the stamp masters leased from Philatelic carried with it the right to print the following limited editions of stamps: 20,000 sets of perforated stamps; 10,000 sets of imperforated stamps; 10,000 deluxe sheets; and 20,000 souvenir sheets. The offering memorandum suggested that participants in the program contact an established stamp distributor to arrange for the marketing of the stamps produced from *281 the leased stamp master. Additionally, the offering memorandum described the stamp master leasing activity as highly speculative. A substantial portion of the offering memorandum discussed the Federal income tax aspects of the stamp master leasing program. Such portion of the offering memorandum contained a 52-page legal opinion, and letters prepared by the New York law firm, Friedman and Shaftan, P.C., and the New York accounting firm, Trager, Glass & Co., stating that the two firms would represent Philatelic (and any of its lessees that requested representation) in the event the Internal Revenue Service challenged the "tax structure" of the program. However, it appears from petitioner's testimony that such representation was not available to petitioner during this litigation. The Philatelic program provided for seven annual lease payments of $ 40,000 each for a four-stamp master [6] which were to be financed primarily by nonrecourse notes. The program also provided that Philatelic would pass through to the investor its right to claim investment tax credit on the stamp masters, such credit being based upon Philatelic's cost of purchasing the masters from Hambrose Stamps, Ltd. *282 (Hambrose). Philatelic's cost for a four-stamp master was allegedly $ 200,000. In the fall of 1981, petitioner first saw an advertisement in the sports section of a local newspaper advertising a business opportunity involving stamps. In response to that advertisement, petitioner attended a promotional meeting for Philatelic held by Mr. Gerald Kozak. At the conclusion of the meeting, petitioner scheduled an appointment with Mr. Kozak so as to determine whether it would be advantageous for him to participate in the Philatelic program. During the meeting, petitioner and Mr. Kozak concluded that petitioner's financial situation was such that he could not properly utilize the investment tax credit which would result from participation in the Philatelic program. [7] Petitioner met with Mr. Kozak the following year, and decided, based on *283 his income at that time, to participate in the Philatelic program. Thus, on November 24, 1982, petitioner agreed to lease a four-stamp master from Philatelic for total consideration in the amount of $ 280,000. Such consideration consisted of: (1) $ 5,000 cash upon closing; (2) a promissory note labeled First Note A in the amount of $ 1,000 due February 1, 1983; (3) a promissory note labeled First Note B in the amount of $ 14,000 due June 30, 1983; (4) a promissory note labeled Second Note in the amount of $ 20,000 due February 1, 1990; and (5) six additional notes, each for the principal amount of $ 40,000 due February 1, 1990. The six additional notes bore simple interest of 10 percent per annum; however, no interest payment was due on the additional notes until the principal of each additional note, and all other notes executed *284 pursuant to the lease agreement, had been paid in full. All of the notes were secured by the products derived from the stamp master and 50 percent of the proceeds from the sale of such products. Petitioner was personally liable for the principal amount and interest due on First Notes A and B. The Second Note provided that petitioner was liable for the principal amount, but not for any interest or costs in connection with any security interest relative to the note. The first additional note specified that petitioner only had personal liability for $ 9,000 of the $ 40,000 principal amount and no personal liability for the remainder of the principal, interest, or costs. The remaining five additional notes were each labeled "Nonrecourse Note" and provided that petitioner had no personal liability for any principal, interest, or costs. The cash and notes were supposed to represent payments for the lease of the stamp master beginning November 1, 1982, and ending October 31, 1989. On February 1, 1983, petitioner paid the entire amount due under the First Note A. On August 10, 1983, petitioner paid $ 7,832.32 of the amount due under First Note B; however, petitioner characterized *285 $ 832.32 of such amount as interest. Petitioner testified that he did not pay the entire amount due under First Note B because Philatelic had failed to live up to its obligations and he was "getting to be a little bit suspicious." Thereafter, none of the other notes were paid. There were at least 442 stamp images from which petitioner and other potential investors could choose to lease. However, the image initially selected by petitioner for the four-stamp master had already been leased to another investor, so petitioner selected another stamp master, stamp master B4551, which consisted of images of dogs, wolves, and jackals. Prior to leasing the stamp master, petitioner neither saw the stamp master he was leasing nor received an independent appraisal of such stamp master. Rather, after having already invested in the four-stamp master, petitioner received three or four appraisals from Philatelic, all of which concluded that the value of the stamp master was $ 371,250. However, petitioner never obtained insurance on the stamp master. After investing in the Philatelic program, petitioner obtained a d.b.a. (doing business as) certificate from the State of California under the name *286 of Jonson Philatelic Printing, Ltd., [8] and opened a checking account under that name. It appears that three checks were written on that account -- two checks to Philatelic and one check to the stamp distributor. In July 1983, petitioner attended the Stamp Expo in Anaheim, California, to find a distributor for his stamps. Ultimately, petitioner chose International Collectors Guild, Ltd. (International), [9] of which Subway Stamp Shop, Inc., is an affiliate. On August 1, 1983, petitioner entered into a 10-year distribution agreement with International. Pursuant to the agreement, petitioner was to pay (and did pay) International $ 2,000 [10] for marketing his stamps. Additionally, the distributor was to receive 25 percent of the gross receipts, based on the wholesale price of the stamps. Pursuant to the distribution agreement, petitioner's stamps were to be sold at retail for no less than 120 percent of their face value (which was not more than 1.5 British pounds). *287 Moreover, although the distribution agreement reserved petitioner's right to sell or distribute 5 percent of the stamps, he never attempted to market any of the stamps on his own. Petitioner also did not attempt to produce and market any products using his stamp image. In August 1983, the first printing of stamps from petitioner's four-stamp master was completed. For the printing, petitioner paid Philatelic an additional $ 2,000. Petitioner received no income from the sale of stamps in 1983. In 1984, petitioner received $ 14 from the sale of the stamps. Petitioner received a letter from the Internal Revenue Service, dated May *288 10, 1984, regarding Philatelic which stated: "Based upon our review of that promotion, we believe that the purported tax deductions and/or credits are not allowable." [11] Nevertheless, on August 17, 1984, after having received the letter, petitioner filed his joint 1983 Federal income tax return claiming a Schedule C loss of $ 47,861 from the stamp master leasing activity; such loss consisted of $ 16 for bank service charges, $ 2,350 for professional services, $ 563 for other expenses, $ 100 for supplies, $ 4,832 for interest expense, and $ 40,000 as rent on business property. Respondent determined that petitioner is not entitled to the deductions claimed on his joint 1983 Federal income tax return in connection with his participation in the Philatelic program. Respondent also determined additions to tax pursuant to section 6653(a)(1) and (2) and increased interest pursuant to section 6621(c). *289 OPINION The primary issue is whether petitioner is entitled to deductions claimed on his tax return which related to his lease of the stamp master from Philatelic. Petitioner bears the burden of proof on this issue. Rule 142(a); . Respondent, in the notice of deficiency, determined that the transaction entered into by petitioner lacked economic substance and was a sham that should, therefore, be disregarded for tax purposes. In the alternative, respondent contends that petitioner was not engaged in a trade or business for profit. Petitioner maintains that he had the requisite profit objective and that the program in which he invested was economically viable at the time of the investment because he honestly believed that he would profit from investing in the program. To establish that the transaction is not a sham and, therefore, be entitled to deductions resulting from the transaction, petitioner must prove that the transaction had a legitimate business purpose and economic substance. See , affg. *290 in part and revg. in part . In determining whether the transaction petitioner entered into is a sham, we look to business purpose and economic substance. Thus, we will first address whether petitioner had a business purpose for entering into the lease with Philatelic. Petitioner testified that he entered into the transaction because "he wanted to get involved in a profit-oriented investment". He stated that after investigating investments in oil leases, windmills, movies, and record albums, he decided that the stamp master lease was the best profit-oriented investment available at the time. However, the record and petitioner's testimony belie petitioner's contention that he entered into the stamp master lease with a profit objective. Prior to his investment in the Philatelic program in 1982, petitioner had limited involvement in the stamp collecting industry. In fact, his only experience with stamp collecting was a stamp album given to him when he was a child by his father. When questioned, petitioner had no idea as to the type, quantity, or value of the stamps contained in the album. Moreover, petitioner had neither experience *291 nor expertise in producing or marketing stamps. Nevertheless, even with this lack of experience, petitioner did not seek advice from anyone knowledgeable in the collecting, producing, or marketing of stamps. Rather, based solely on the representations contained in the offering memorandum and the information provided by Philatelic's promoter, Mr. Kozak, petitioner entered into the lease agreement with Philatelic, paid $ 5,000 in cash, and signed notes for an additional $ 275,000. Petitioner did not have, nor did he seek, any information as to the value of the stamp master. The offering memorandum, upon which petitioner relied, emphasized the tax aspects of the program rather than its profit potential. In fact, petitioner waited to partake in the Philatelic program until he could fully utilize the tax benefits. Furthermore, he did not independently investigate the stamp industry, the market for British local stamps, or the viability of the proposed venture. See , on appeal (4th Cir., Oct. 13, 1992). Petitioner did not even subscribe to one of the more popular stamp periodicals. At trial, James A. Willms *292 [12] testified as an expert witness for respondent on the value of the stamp master leased by petitioner. In Mr. Willms' opinion, the stamp master had no value because it would not be possible to profitably market the stamps produced by the stamp master. He further stated that the quality of the printing and art on petitioner's stamps was poor, that the subject matter of the stamps was unpopular, and that there was no market for local carriage labels. At trial, Mr. Willms testified that a subscription to any one of the stamp periodicals would have informed petitioner that there was no market for local stamps within the stamp collecting community. Petitioner did not present any expert testimony. *293 Prior to entering into the lease with Philatelic, petitioner failed to receive an appraisal of the stamp master he was leasing nor did he obtain information concerning possible distribution arrangements for the stamps and ancillary products. Petitioner did not negotiate any of the terms of the lease or notes with Philatelic. See id.
Petitioner entered into the distribution agreement with International without negotiating the terms of the agreement and took no action to change the marketing strategy when the stamps did not sell. Moreover, even though under the terms of the distribution agreement petitioner was entitled to sell up to 5 percent of the stamps, he did nothing to promote the sales of the stamps. See id. Accordingly, notwithstanding petitioner's subjective assertions as to his profit-objective goals, based on this record we believe that petitioner did not have the requisite business purpose when he entered into the lease arrangement with Philatelic. Secondly, we address whether the transaction had economic substance. This inquiry is objective and requires an analysis of the transaction such as a prudent businessman would do, so as to ascertain whether it *294 had any economic substance apart from the beneficial tax aspects. It is well established that a transaction which is devoid of economic substance is not recognized for tax purposes. . Petitioner contends that he entered into the transaction to make a profit from the sale of the stamps, not for the tax benefits of the program. Further, he claims that even though the program in which he invested was later deemed to be without economic substance, his profit objective is sufficient to establish his right to the deductions claimed. This argument is without merit. In determining whether a transaction has economic substance, a taxpayer's subjective statement as to his profit objective in entering into the transaction does not require the Court to recognize a transaction for tax purposes which lacks economic substance. . A realistic potential for profit exists "when the transaction is carefully conceived and planned in accordance *295 with standards applicable to the particular industry, so that judged by those standards the hypothetical reasonable businessman would make the investment." . Once again, for the same reasons discussed with regard to business purpose, we do not believe that the transaction had economic substance. Accordingly, respondent's determination that petitioner is not entitled to the claimed deductions with respect to the lease of the stamp master is sustained. Claimed Interest on Note
On petitioner's 1983 Federal income tax return, he deducted $ 4,832 as interest paid on the $ 14,000 note due June 30, 1983. After examining the stipulation of facts and the evidence presented, it appears the maximum amount which could be considered interest is $ 832.32. In , the Court of Appeals for the Fourth Circuit held that interest paid on recourse debt incurred in connection with a sham transaction is deductible if the recourse notes are genuine obligations. Although the $ 14,000 note executed by petitioner appears to be recourse on its face, petitioner paid only a *296 portion of the principal amount and no action was taken by Philatelic for the remaining balance. Cf. ; Accordingly, we do not believe that the note represented a genuine recourse obligation upon which principal and interest were to be paid, and therefore we sustain respondent's determination on this issue. Section 6653(a)(1) and (2)
Section 6653(a)(1) imposes an addition to tax if any part of an underpayment of tax is due to negligence or intentional disregard of rules or regulations. Section 6653(a)(2) provides for an addition to tax in an amount equal to 50 percent of the interest on the portion of the underpayment attributable to negligence. Negligence is the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. . Petitioner claimed deductions relating to the lease of the stamp master after already being notified by the Internal Revenue Service that respondent believed such deductions *297 were not allowable. Additionally, although petitioner lacked experience in the stamp industry, he made no effort to inquire into the economic viability of the program. Rather, he accepted the packaged program with nothing more than the assurances attached to the offering. Petitioner's failure to make a meaningful investigation beyond the promotional materials supplied by the promoters or to consult independent advisors was not reasonable or in keeping with the standard of the ordinarily prudent person. See , affd. without published opinion sub nom. , affd. without published opinion . Finally, petitioner's contention that he is not negligent because respondent is estopped from determining additions to tax because respondent tacitly approved the Philatelic program by paying the full amount of the refund of tax claimed by petitioner for the 1979, 1980, 1981, and 1982 tax years has no merit. It is well settled that payment of a refund does not estop respondent *298 from later determining a deficiency in the same year or any other year. Such payment is neither implied nor express approval of the items reported on the return at issue before the Court. ; , affg. ; . Accordingly, we hold that petitioner is liable for the additions to tax under section 6653(a)(1) and (2). Section 6621(c)
Section 6621(c) provides for an increased interest rate with respect to any "substantial underpayment" (greater than $ 1,000) in any taxable year "attributable to 1 or more tax motivated transactions". The increased rate of interest applies as of December 31, 1984, even though the transaction was entered into prior to the enactment of the statute. , affd. without published opinion . The term "tax motivated transaction" includes any "sham *299 or fraudulent transaction". Sec. 6621(c)(3)(A)(v). The statutory language encompasses transactions which lack profit objective and which are without economic substance. . Based on this record, respondent has proven that the Philatelic program had no economic substance, and that the underpayment attributable to the program exceeded $ 1,000. Accordingly, the increased rate of interest applies to the underpayment attributable to all deductions taken with respect to the Philatelic program. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. Originally, petitioner's former wife, Rose Ann Johnson, was a co-petitioner. However, after the petition was filed by both petitioners, the case of Rose Ann Johnson was severed, assigned a different docket number, and closed.↩
2. All section references are to the Internal Revenue Code in effect for the year at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. Due to a typographical error in the notice of deficiency, such amount was erroneously reflected as an addition to tax under sec. 6661(a).↩
4. Because this adjustment was raised by respondent in the Answer, respondent has the burden of proof on this issue. See Rule 142(a).↩
5. In the "Explanation of Items" attached to the notice of deficiency, respondent determined that petitioner was not entitled to the investment tax credit claimed on his 1983 tax return. However, the investment tax credit was erroneously not disallowed in the computation of the deficiency. Accordingly, respondent concedes this issue.↩
6. Philatelic provided for the leasing of two-stamp, four-stamp, six-stamp, and eight-stamp masters. Petitioner's agreement with Philatelic was for the leasing of a four-stamp master.↩
7. In other words, this means that petitioner would not generate sufficient income tax refunds through investment tax credit carrybacks to pay for a substantial portion of the investment.↩
8. The different spelling of Johnson was deliberate.↩
9. This is the same distributor recommended by Philatelic and used by the taxpayers in , on appeal (4th Cir., Oct. 13, 1992).↩
10. It appears that petitioner paid International $ 2,350, rather than $ 2,000 as provided in the agreement. Petitioner has not provided any explanation regarding this discrepancy.↩
11. Subsequently, the United States District Court for the Southern District of New York determined that the stamp master leasing program promoted by Philatelic was an abusive tax shelter, and enjoined the promoters from further promoting the leasing of stamp masters. In granting the injunctive relief, the District Court found that the stamp masters leased by Philatelic were grossly overvalued within the meaning of sec. 6700. See , affd. .↩
12. Mr. Willms is executive vice president, director, and vice chairman of the board of Unicover Corp., an international direct marketer of philatelic products, coins, porcelain, and art prints located in Cheyenne, Wyoming. In addition, Mr. Willms is president of Unicover World Trade Corp., a wholly owned subsidiary of Unicover Corp.↩